v. ChemTreat It's Mr. Black, correct? Mr. Little. Mr. Little. Yes, that's right. I'm sorry. May it please the Court, I'm Bruce Little. I'm here on behalf of the appellants, U.S. Water Services, Global Process Technology, and Roy Johnson, the patent owners in this case. The district court erred in finding that ChemTreat had standing to seek a declaratory judgment of non-infringement. The recent decisions of this court, including the decision issued last Friday in the Microsoft v. DataTurn case, I hope I pronounced DataTurn correctly, have made it clear that when an allegedly accused product is capable of multiple uses, a claim against a customer for infringement would not automatically give rise to an indirect claim against the supplier. Here, in addition to the fact that the product supplied by ChemTreat, the enzyme Phytase, has multiple uses, there was no claim for infringement against an infringer. The patent at issue in this case, the 244 patent, is for reducing insoluble deposit formation in the production of ethanol. In order to directly infringe, you have to operate an ethanol plant. ChemTreat doesn't operate an ethanol plant. In this case, there's evidence in the record that your client communicated with customers at ChemTreat, and in those communications, raised the specter of infringement, and talked about the patents in such a way that they were asserting that you're acting illegally because we have a patent here. Your Honor, there is evidence in the record that they communicated with customers of theirs, as well as potential customers of ChemTreat. But that doesn't help you. If they're telling their own customers, they're asserting their patent, and then they're asserting the patent in communications with the customers of their competitor. Your Honor, respectfully, I would characterize their communications differently, both than you are and that the district court did. The communications with their customers referred to their patents. If you look at the actual customers with whom they communicated, they communicated with customers with whom they had an exclusive supply relationship. They say you're in breach, but they mention the patent. They do mention the patent. They mention the fact that they were in the process of prosecuting a patent. No patent had issued at the time of any of these communications. And in fact, at the time of some of the early communications, the patent had been rejected. It had been approved in Europe, but had not been approved in the United States. It had not issued. The communications in each case were with a customer who had a nondisclosure agreement. Let's take a look at one of those communications, and this is a follow-up to Judge Wallach's question. There's a communication in an email, A174, where U.S. Water told a potential Chemtree customer, I need to speak with you later today about the Chemtree offering and what has happened. They are on very thin ice and are putting people at risk. Chemtree is putting people at risk by offering their services. And then it goes, the very next sentence, it says, while our EPO patent application has been allowed, the USPTO patent prosecution remains painfully slow and underfunded agency. Isn't that joining the patent and the threatening with very thin ice and threatening the customers? No, Your Honor. The customer with whom that communication was made was a customer who had already entered into an exclusive supply agreement with U.S. Water. That customer was the customer that passed along an advertisement that it had received from Chemtree to U.S. Water. U.S. Water had been unaware that Chemtree was promoting its products, was promoting the fact that it had a price advantage over U.S. Water's fight-out process. And the communication was a personal communication between two individuals, Roy Johnson, one of the inventors, and the customer who had a longstanding relationship and was discussing the status of what was going on in the marketplace, the Chemtree. What do they mean when they say that consequences get too many attorneys involved? Couldn't the district court reasonably read that as relating to the patent as opposed to the exclusive? Your Honor, I don't think in the context where, again, you had an exclusive arrangement, you had a customer who did not. But the problem is that the customers were fleeing. And it appears that your client was seeking to prevent Chemtree from even approaching the customers. Our client was, in fact, seeking to compete with Chemtree when Chemtree introduced a new product in the marketplace. But, again, communication that has been referred to. You're on thin ice. These folks are putting you on thin ice. Let's not get too many lawyers involved. That's not a threat of litigation. Well, in that particular context, there was already litigation pending or about to be pending between U.S. Water and Chemtree. That was the trade secret litigation. I'm confident, although it's not in the record, I'm confident that that's what was being referred to. Spending too much money on lawyers is a common complaint in many, many industries. When you do it in the context of talking about a patent, then aren't you saying that you're risking patent infringement? In this instance, no. There was no patent that had been issued at the time of this communication. But you're talking about we have an application. It's kind of like we have an application for a patent. You better watch out. You're on thin ice if you go with this other company. And if you go with them, there's going to be a lot of lawyers involved. Now, I don't know if the email read the way I said it, but isn't that a threat? Your Honor, it isn't in that case because, A, if lawyers were going to be involved in that particular instance, those lawyers would have been involved in a breach of an exclusive supply agreement that had already been signed. But your email isn't related to that. I mean, I understand what you're saying. You have exclusive relations with a lot of customers, and you hear that Chemtree is going around and undercutting you on price, and you go back to them and say, look, you have an exclusive relationship. You can't do that. We'll sue you. You didn't stop there, though. You went on and said, we have these patents pending, and that's going to put people at risk, too, and not just you, but suggesting other people, including likely Chemtree, who is going around, in your view, violating your patent. So if you would have confined it to the contracts, you might have a better argument. But why isn't the fact that you're referencing pending patent applications to your customers and suggesting to them that Chemtree is going to get people in trouble enough to satisfy a threat of suit to Chemtree for declaratory judgment action? Your Honor, in this particular context, the communication was to a customer that had provided information voluntarily to you. I don't see why that matters. I mean, it's going to get back to Chemtree that the customers it's approaching are getting told by you that you better not go with them because we're going to sue on patent claims. That's enough. If they hear that, and clearly they heard that, that's enough for declaratory judgment action, isn't it? Your Honor, in this context, I don't think that communication means what the court and what you are suggesting. Well, if it does mean what we think it means, though, isn't that going to be enough for declaratory judgment action? No, Your Honor, I don't think it is. In light of the decision in Microsoft versus DataTerm and in the Cisco decision, I don't think it is because there was no threat to Chemtree being communicated. Chemtree has never been threatened with patent infringement. Does it have to be a direct threat? No, it doesn't have to be a direct threat, but in this particular instance, this was not a customer of Chemtree. This was not a potential customer of Chemtree. Well, isn't that good enough? It was not a potential customer given their exclusive relationship with – In your view, it's not a potential customer. I mean, clearly they thought it was a potential customer because they approached them. We're talking about the marketplace. Even though a company has an exclusive agreement with another company, they're still free to breach that agreement if it makes business sense. That's correct, Your Honor. So, they were talking to a potential customer of Chemtree. Your Honor, they sent the advertisement to ethanol plants, many ethanol plants, not this one with any specific intent. I would grant you that maybe Chemtree is overreaching in its break when it says that USWS threatened by expressly mentioning the patent rights and stating in no uncertain terms it gets too many attorneys involved. It may be a little fuzzier than that, but I go back to what I asked you, which is couldn't the district court reasonably determine based on this that, in fact, this was a threat? Your Honor, I don't think in light of the other evidence in the record, in light of the fact that, as I've explained already, that this was a customer who was voluntarily cooperating with US Water, informing them of what a competitor was doing, that this particular communication could be viewed as a threat. I don't think the other communications where they proudly announced the issuance of their patent to the marketplace are a threat. I don't think, we have to distinguish between references to the fact we've got a patent and the fact that, and the allegation that there was a threat against particular companies. Let's take a look then at your complaint. This is at A0061, paragraph 14. It seems to me that it definitely ties together the patent and what you call the confidential protocols or the know-how. It clearly says, in addition to the technology disclosed and claimed in the US patent application, so you have the technology disclosed, claimed in the patent. The system is supported by confidential information. You tied that together in your complaint. Why is it unreasonable for the district court to look at the communications to the client and see a tie-in there? The reason that it's tied together in the complaint is so that it could be clearly distinguished. You had a published patent application. Anything published in the patent application would not necessarily be a trade secret. It's published. And so it was important to make it clear in the complaint that there was additional information which was a secret, which US Water was seeking to protect. You're in your rebuttal time. Do you want to save that? No, Your Honor. I will save it for rebuttal. Thank you. Mr. McCarthy? May it please the Court, Michael McCarthy for Appellee Chemtreat. There are a few things I want to address, Your Honors. I have a few questions for you. Okay, regarding? On page 9 of its brief, Chemtreat says, as a result of US Water's assertion of its patent, a particular producer canceled its order for Chemtreat's products. Where in the cited transcript, and you cite 792, where does it say that at 792, that the order cancellation resulted from patent infringement as opposed to general legal ramifications including patent rights? I think that's the testimony of Mr. John Wenger, and he does say that Green Plains Renewable Energy, I believe, is the customer, canceled their order. And I think he says because of the legal ramifications. And when you view the situation. Why isn't that contract as opposed to patent? I think that goes back to what the district court says. If this was about contracts, if they were communicating with Chemtreat's customers about contracts, there was absolutely no reason to mention patents. For instance, in the. Yeah, but you're doing apples and oranges there. I'm asking you, you gave me a site to 792, saying that it was a result of assertion of its patent. But you're citing to something where the testimony is, and I might add it's leading, but he says stating there were legal ramifications. That doesn't necessarily mean anything about patent. I will grant you that's exactly what the testimony was. When viewed in context with all of the statements that were being made in the marketplace regarding their patent applications. You didn't give me sites to all of it. I apologize for that. On page 31 of its brief, Chemtreat. All of these are about overreaching as far as I'm concerned. I've already talked to your opposing counsel about some stuff, but let me ask you these. On page 31, Chemtreat says that a representative of a renewable fuel company expressly affirmed that he would still be buying PE1000 from Chemtreat, but for a U.S. water statement. That's a quote. In the testimony, when he's asked about that, his response to a leading question at 847 is, that's probably fair. Now, I have a real problem with your then saying, after you have a leading question, which wasn't objected to, I'll give you that. But nevertheless, he says that's probably fair. How is that an affirmative express affirmation? Well, I think he was asked a question. There was no objection, and he agreed to it. He didn't say, well, no, I don't agree with that characterization. He equivocated. He said that's probably fair, which can mean it's not fair, right? I think when he says probably, that means more than likely it is fair. I think it doesn't mean that it's not fair. I think when you read that statement, the clear import is that he's agreeing with the question that was put. It's funny, when I read it, I thought, this doesn't support what's the express affirmative statement that's made in the brief. I think that, if I may, Your Honor, the other thing to keep in mind here is, we cannot separate this from the context of the other statements. As Arrowhead gives us guidance, when someone is creating insecurity and uncertainty in the market, I don't disagree with you overall about the weight of the evidence. That's why I asked your opposing counsel those questions. But what I am saying is you've made some specific statements in your briefs. Then I turn to the page that you cite, and I don't see that it supports it. So I have some more questions. Okay. This one we've already discussed, JA-174, the email. You characterize that as an express threat of patent infringement litigation. Aren't you going too far? Well, I think let's look at that statement. That's a statement by the inventor. He mentions that the European patent is issued. He mentions litigation, lawyers. Excuse me. I didn't mean to speak over you. No, he gives the specter of lawyers coming in. He mentions that the USPTO is painfully slow, and then goes on to say the consequences get too many terms involved. The USPTO is painfully slow. Doesn't that undermine the threat? I don't think it does. We have a patent application pending, but don't worry about it. It's painfully slow, but we do have a trade secret claim. I don't think it does. When you go back to the Hewlett-Packard case in this court where to create subject matter jurisdiction, the magic words don't have to be used. Litigants and their parties get very, very good at crafting their statements in a way that don't trigger the magic words. This is just one of those instances. They don't have to come out and say we are going to sue them for infringement of our patent application as soon as it issues. This is another way of saying it's painfully slow. We have our European patent. When the US patent issues, we're going to court. The problem in this case is that we run the risk if we affirm. We run the risk of creating jurisdiction in many trade secret litigation or trade secret claims and maybe even casting some sort of chill over folks from bringing a trade secret claim out of the fear that they're also going to raise patent litigation claims. What's the answer to that? How closely must we find that the appellant, that US Water Services tied together the technology and its patent in all of its communication? How closely tied does that have to be? I think there may be a case to revisit the Goodyear, Vanguard, Arkema line of cases, but this isn't it. From the very first complaint, all three of their complaints here specifically referenced the then pending application. The second amended complaint, the operative trade secrets complaint, quoted the claim language, attached the patent application as an exhibit to the complaint, and used the application to help define the technology that was at issue in the trade secrets complaint. Sorry, go ahead. If they had written their complaints more carefully and just made allegations about the trade secret action and the like and hadn't referenced the patents, do you think that you wouldn't have declaratory judgment standing here? No, for other reasons. Is that reason all these other communications to their customers and their suppliers and things like that that are both talking about the trade secrets and potential patent litigation? I think that's where those... Sorry, if the answer to that is yes, which I assume it is, that's where it seems to be a little bit of a problem because any good business, when they go out and talk to their customers, is going to say, look, we have exclusive agreements based upon trade secret processes and stuff, whatever. But also there's this potential for patent litigation. You should be careful about that too. That just makes common sense. And that seems to suggest that just by doing good business practices, if they file what they only want to be a trade secret action and don't intend to pursue any kind of patent litigation, you nonetheless have the unilateral right to file a declaratory judgment action. I think that under MedImmune and Maryland Casualty, we have to view this under the totality of circumstances. And there's a continuum of where these cases may land. I think that the hypothetical of removing all of these allegations from the complaint would push a case down farther on the continuum toward no jurisdiction. I suppose your answer really would be that even if they hadn't filed this trade secret X case, you would still have had standing to bring your own declaratory judgment action based upon all these allegations that they're going to their customers and to their suppliers and stuff and noting their patent and that you're potentially violating it. I agree 100%. If I could mention the statements they made to Chemtreat's original Phytase supplier, DSM. The president of the company, president of U.S. Water, said we have a European patent application or a European patent. USPTO will issue our applications soon. They are going around our patent application. We've sued them once and we're going to sue them again. I mean, to me, those are threats that push this way farther down the continuum toward a case for controversy, even aside from the prior litigation. If I could address the Cisco and Microsoft cases for a moment, your honors, Cisco distinguished Arkema, which we believe is much like our case, nearly identical, on the basis that there was no prior litigation in Cisco. There was no prior litigation against Microsoft in the case that was issued Friday. Here we have U.S. Water's express actions shown they are willing to sue Chemtreat to enforce this technology. We believe that's a distinguishing factor from those cases. Also, if I could address the no indirect infringement. U.S. Water articulated in response to Chemtreat's summer judgment motion, U.S. Water articulated exactly how they thought Chemtreat was infringing. By advising Chemtreat's customers to put the phytase in the fermenters or in tanks immediately upstream of the fermenters, U.S. Water said that infringed. They said it in their summary judgment brief. They said it with a declaration of the Ph.D. patent attorney. It's also a chemist who wrote the patent. And if U.S. Water was, and I think this is the most important fact here, if U.S. Water really believed there were non-infringing uses, you would have seen that in the communications to the customers. So the customers where they're talking about too many lawyers getting involved or the communication to the supplier where they say they're going around our patent application, they would have qualified that and said, look, there are uses, some uses of phytase that might be non-infringing. That seems unlikely. I mean, if they want to be the supplier of the product, they're not going to suggest to their customers and the people they get the product from, well, if you don't want to get it from us, here's how you can do it. I mean, that's really stretching it, isn't it? I think it's unlikely if they're communicating to them about contractual issues. But if they're communicating to them about patent issues, they absolutely need to say that. I'm going to throw in one more question on your brief, and that is at page 37. You have Mr. Bly told someone that Chemtreat was, quote, going around our patent application, buying your product. And going around our patent application, bold-faced, and you characterize that as a threat. Why did you leave off the rest of the sentence that says, in violation of our supply agreement? Getting back to the same reason the district court found these statements to be threats, that if it was really about the supply agreement, then there's no reason to bring up the patent application and say they're going around it. For that simple reason, Your Honor. Any questions? That's it. Thank you. I will submit the rest of my time. Mr. Little, I'm going to restore you back to your four minutes. Thank you, Your Honor. I want to address the supply agreement issue very quickly. The supply agreement was an exclusive supply agreement between U.S. Water's supplier, and it was U.S. Water's position that by selling Phytase to Chemtreat, that agreement had been breached. And the communication was directed to the supply agreement, entirely to the supply agreement, mentioned the existence of the patent, but there was no threat and could be no threat of patent infringement against that supplier. It was simply, don't sell them Phytase, you've got an exclusive agreement with us. And, again, you've got a company that's excited about having. Then why mention the pen at all then? Because you've got a company president who is excited about the fact that he's got a patent and who is, you know, talking to someone else in the industry about the fact that I have this competitive problem. They're going around my patent by getting a supply from you. I can understand that, but to do it in the same letter, where they're discussing potential litigation over trade secrets and to assert the patent and to assert risk, it doesn't seem to me that it's sales material that was described in the patent. It wasn't sales material, Your Honor. It was, you're in breach of your supply agreement to us. You need to stop supplying them. What about the fact that we went over this with your opponent, that your complaint ties together the patent and the technology that's supposed to have been confidential? As I explained, Your Honor, the purpose of the reference to the patent in the complaint was to distinguish between the confidential information that was not included in the patent. One of the things that was not mentioned in the patent that we regarded as confidential was slug feeding as opposed to gradual feeding. You're suing for trade secret violation, correct? Right. You're not suing for patent infringement, but yet you attach, in another complaint, you attach the patent to the complaint and you bring it up in your accounts. So it seems to me that you created or rather the complaint kind of affirms what happened before by tying together, by overlapping trade secrets and infringement. I mean, the court's looking at that. They have a patent before them. There's a discussion of the patent. Doesn't that by itself give grounds for a case of controversy? No, Your Honor, because if you read the complaint, it specifically says that what's in the patent is public. It's been published. And the trade secrets that are being asserted are not published as part of this public document. U.S. Water was assuming, I think probably correctly, that had they not raised the issue of the patent in some fashion in the complaint, the response would have been, these aren't trade secrets. These are all disclosed in your patent application. If I may address one more question quickly in my remaining time, the response to the summary judgment motion, again, dealt with a complete hypothetical. There was no chemtreat customer that was being discussed in their brief or in our brief. It was always a hypothetical customer. It's here's what we'll do if we can sell our PE1000 product to somebody. We don't have any buyers, any active users yet. Here's what we'll do. And our response was, well, if you do it this way, you'll still be infringing. If you do it another way, you won't. Thank you, Your Honor. Thank you.